**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WACHALA, MARY BETH PREUSS, PATRICIA WALSH, SADE ADENEYE, MIKE BICKLE, AND JACQUELINE GOUGH, individually and as representatives of classes of participants and beneficiaries on behalf of the Astellas US Retirement and Savings Plan, | Civil Action No. 1:20-cv-03882 |
| *Plaintiffs*, | Hon. Ronald A. Guzman |
| v. | Magistrate Judge Heather K. McShain |
| ASTELLAS US LLC, THE BOARD OF DIRECTORS OF ASTELLAS US LLC, THE ASTELLAS RETIREMENT PLAN ADMINISTRATIVE COMMITTEE, AND AON HEWITT INVESTMENT CONSULTING, INC. (NKA AON INVESTMENTS USA, INC.), | AMENDED COMPLAINT—CLASS ACTION |
| *Defendants*. | JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

1.      Plaintiffs Michael Wachala, Mary Beth Preuss, Patricia Walsh, Sade Adeneye, Mike Bickle, and Jacqueline Gough, individually and as representatives of classes of participants and beneficiaries of the Astellas US Retirement and Savings Plan, bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants Astellas US LLC, the Board of Directors of Astellas US LLC, the Astellas Retirement Plan Administrative Committee, and Aon Hewitt Investment Consulting, Inc. (nka Aon Investments USA, Inc.) for breach of fiduciary duties and prohibited transactions under ERISA.[1]

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461. All Defendants are collectively referred to as "Defendants". Aon Hewitt Investment Consulting, Inc. is referred to as "Aon Hewitt". Astellas US LLC is referred to as "Astellas". The Astellas-affiliated defendants are collectively referred to as the "Astellas Defendants."

2.      The marketplace for retirement plan services is established and competitive. Large defined contribution plans, like the Plan, have tremendous bargaining power to obtain high quality, low-cost investment management services. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. These duties are the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Aon Hewitt acted in its own interest by causing the Plan to invest in Aon Hewitt's proprietary collective investment trusts, which benefitted Aon Hewitt at the expense of Plan participants' retirement savings. The Astellas Defendants also failed to use the Plan's bargaining power to negotiate reasonable fees, which caused unreasonable expenses to be charged to the Plan and participants for investment management services.

3.      To remedy these breaches of duty, Plaintiffs, individually and as representatives of classes of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.      **Venue.** This District is the proper venue for this action under 29 U.S.C.

§1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides or may be found.

6. **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to bring a civil action to seek relief on behalf of a plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, each Plaintiff has suffered such an injury, in at least the following ways:

    a. The named Plaintiffs suffered harm to their individual accounts as a result of Defendants' fiduciary breaches. During the proposed class period, Plaintiffs Preuss invested in each of the Aon Hewitt collective investment trusts provided in the Plan. Plaintiffs Wachala and Walsh invested in each of the Aon Hewitt funds with the exception of the Aon Hewitt Inflation Strategy Fund. Plaintiff Bickle invested in each of the Aon Hewitt funds with the exception of the Aon Hewitt Non-US Equity Fund, and Plaintiff Adeneye invested in the Aon Hewitt Core Plus Bond Fund and the Aon Hewitt Large Cap Equity Fund. By providing the Aon Hewitt collective investment trusts, Defendants caused millions of dollars in performance losses to all participants who invested in these funds.

b. The named Plaintiffs suffered harm to their individual accounts as a result of the Astellas Defendants selecting and retaining higher-cost shares of the Plan's investments, including the Aon Hewitt collective investment trusts. Had the Astellas Defendants provided the lowest-cost shares of the Plan's investments, the Named Plaintiffs' and every participant's account would have had fewer investment management fees deducted and would have been of higher value in light of those fees and the investment return on those fees.

## PARTIES

### The Astellas US Retirement and Savings Plan

7. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which certain employees of Astellas and its affiliates may participate.

8. The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1), last amended and restated on October 1, 2016.

9. Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on the amount contributed to the account by the employee and employer, and the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

10. As of December 31, 2013, the Plan had $623 million in net assets and 3,796 participants with account balances. By December 31, 2018, the Plan had grown to $932 million in net assets and 3,967 participants with account balances. The Plan's size gave it substantial bargaining power to command very low investment management fees for its participants.

**Plaintiffs**

11.     Michael Wachala is a former employee of Astellas. He resides in Lowell, Massachusetts. He was a participant in the Plan until the end of 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for the purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amount by which his account would have been greater had Defendants not breached their fiduciary duties.

12.     Mary Beth Preuss is a former employee of Astellas. She resides in Parkville, Missouri. She was participant in the Plan through approximately May 2020. However, she is still a "participant" under 29 U.S.C. §1002(7) for purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because she is eligible to receive her share of the amount by which her account would have been greater had Defendants not breached their fiduciary duties.

13.     Patricia Walsh is a former employee of Astellas. She resides in Brentwood, Tennessee. She was a participant in the Plan until approximately December 2019. However, she is still a "participant" under 29 U.S.C. §1002(7) for the purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because she is eligible to receive her share of the amount by which her account would have been greater had Defendants not breached their fiduciary duties.

14.     Sade Adeneye is a former employee of Astellas. She resides in Reseda, California. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Mike Bickle is a former employee of Astellas. He resides in Wollforth, Texas. He was a participant in the Plan until approximately March 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for the purposes of bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amount by which his account

would have been greater had Defendants not breached their fiduciary duties.

16.     Jacqueline Gough is a former employee of Astellas. She resides in Lincolnshire, Illinois. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

17.     Astellas US LLC ("Astellas") is a pharmaceutical product manufacturing limited liability company headquartered in Northbrook, Illinois and incorporated in Delaware. Astellas is a subsidiary of Astellas Pharma US Inc. Astellas Pharm US Inc. is an affiliate of Astellas Pharma, Inc., a Japanese corporation headquartered in Tokyo, Japan.

18.     Astellas is the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). The Plan document presently designates Astellas as a named fiduciary and plan administrator under 29 U.S.C. §1102(a)(2) with full power and authority to manage and administer the Plan. As alleged herein, Astellas exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

19.     The Board of Directors of Astellas ("Astellas Board") oversees the overall governance of the Plan and has discretionary authority or control over the selection, monitoring, and removal of Plan investments. The Astellas Board exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

20.     The Astellas Retirement Plan Administrative Committee ("Administrative Committee") is a named fiduciary of the Plan under 29 U.S.C. §1102(a)(2) and was formed by Astellas to administer the Plan. In addition to being a named fiduciary, the Administrative Committee entered into an investment management agreement on behalf of the Plan, which appointed Aon Hewitt as the Plan's discretionary investment manager as defined by 29 U.S.C. §1002(38).

21.     Because the Astellas individuals and entities described above acted as alleged herein as agents of Astellas, these defendants are collectively referred to hereafter as the "Astellas Defendants" unless otherwise indicated.

22.     Aon Hewitt Investment Consulting, Inc. ("Aon Hewitt") is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Chicago, Illinois. In March 2020, the firm began operating as Aon Investments USA, Inc. From at least 2010 through August 25, 2016, Aon Hewitt (then known as Hewitt EnnisKnupp, Inc.) was a fiduciary to the Plan because it rendered investment advice for a fee with respect to the Plan. 29 U.S.C. §1002(21)(A)(ii). Effective August 26, 2016, Astellas and the Administrative Committee appointed Aon Hewitt as the Plan's discretionary investment manager as defined by 29 U.S.C. §1002(38).

23.     As alleged herein, prior to August 26, 2016, Aon Hewitt rendered investment advice for a fee with respect to the Plan's assets, or had authority or responsibility to do so, and was a fiduciary under 29 U.S.C. §1002(21)(A)(ii), and separately, since August 26, 2016, Aon Hewitt has been the investment manager and a fiduciary under 29 U.S.C. §1002(38), with the power to manage, acquire, or dispose of any asset of the Plan.

### ERISA'S FIDUCIARY STANDARDS

24.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A)    for the exclusive purpose of
> >
> > > (i)  providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > [and]
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

26.    An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would

make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting

RESTATEMENT (SECOND) OF TRUSTS §227 (1959)). "[T]he duty to conduct an independent

investigation into the merits of a particular investment" is "the most basic of ERISA's

investment fiduciary duties." *Id*. at 435.

27.     A defined contribution plan fiduciary cannot "insulate itself from liability by the

simple expedient of including a very large number of investment alternatives in its portfolio and

then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere &*

*Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and

continue to monitor, the prudence of *each* investment option available to plan participants."

*DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29

C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a

continuing duty to monitor investments and remove imprudent ones" within a reasonable time.

*Tibble*, 135 S. Ct. at 1828–29.

28.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C.

§1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach

by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in

relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a
> fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of
> another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act
>         or omission of such other fiduciary, knowing such act or omission is a
>         breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the
>         administration of his specific responsibilities which give rise to his status
>         as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

29.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[2] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

30.     A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

31.     Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Plan expenses can

---

[2] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

"significantly reduce the value of an account in a defined-contribution plan." *Id.* The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

32.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. The investment alternatives each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to 1/100[th] of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

33.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000, as shown in the following graph.[4]

---

[3] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.



34.     Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

35.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large defined contribution plans which have the bargaining power to

obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

36.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for plan-related services. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

37.     Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations to include the provider's proprietary funds and services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.    Defendants restructured the Plan in 2016 by replacing established funds with Aon Hewitt's proprietary collective investment trusts.**

38.     The Astellas Defendants initially hired Aon Hewitt to provide investment advisory services with respect to the Plan. Effective August 26, 2016, Astellas and the Administrative Committee expanded that responsibility and appointed Aon Hewitt as the discretionary investment manager for the Plan with discretion over the selection, retention and removal of Plan investments. The Astellas Defendants retained the fiduciary responsibility to ensure that Aon Hewitt carried out its fiduciary obligations loyally and prudently, and had the

13

duty to prevent any fiduciary breach in the selection and removal of Plan investments.

39.     Astellas and the Administrative Committee did *not* require that Aon Hewitt consider all prudent investment vehicles that were available to the Plan prior to making any investment decision. In direct violation of their fundamental fiduciary obligations, Astellas and the Administrative Committee expressly agreed to allow Aon Hewitt to select for the Plan *exclusively* from its proprietary Aon Hewitt collective investment trusts, and agreed that Aon Hewitt had no obligation to consider non-proprietary investment vehicles for the Plan. Although Aon Hewitt acted as the Plan's discretionary investment manager over the Plan's investments, Astellas retained the authority to request that Aon Hewitt retain any Plan investment not recommended by Aon Hewitt for inclusion in the Plan.

40.     After Aon Hewitt became the Plan's discretionary investment manager, on or about October 3, 2016, Defendants restructured the Plan. The Astellas Defendants "partnered with Aon Hewitt" to develop a new investment lineup for Plan participants. With one exception (T. Rowe Price Health Sciences mutual fund), Defendants removed all of the Plan's mutual funds (9 in total) and replaced them with six collective investment trusts. Five of those collective investment trusts were Aon Hewitt's proprietary collective trusts: the Aon Hewitt Large Cap Equity Fund, the Aon Hewitt Small & Mid Cap Equity Fund, the Aon Hewitt Non-U.S. Equity Fund, the Aon Hewitt Inflation Strategy Fund, and the Aon Hewitt Core Plus Bond Fund. (The Plan's Aon Hewitt funds no longer include "Aon Hewitt" in the fund name.) Defendants also replaced five of the Plan's BlackRock collective investment trusts with those managed by State Street Global Advisors Trust Company (SSgA).

41.     Collective investment trusts are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts

14

exempt from Federal income tax". 29 C.F.R. §9.18(a)(2). A collective investment trust is similar to a mutual fund or other pooled investment vehicle because it also invests in a variety of securities to create a diversified investment portfolio.

42.     As a non-depository bank, Aon Trust Company LLC maintains the Aon Hewitt collective investment trusts and is the trustee of the funds. Both Aon Trust Company and Aon Hewitt are wholly owned subsidiaries of Aon Consulting, Inc. Aon Trust Company hired Aon Hewitt—effectively hired itself—as the investment adviser to perform investment advisory and investment management services with respect to each fund.

43.     Aon Trust Company and Aon Hewitt did not offer collective investment trusts to investors until October 2013.[5] Prior to that date, Aon Hewitt had not served as an investment manager of any collective investment trust provided to defined contribution plans. Aon Hewitt therefore had a limited track record as an investment manager prior to the inclusion of the Aon Hewitt funds in the Plan.

44.     Aon Hewitt does not actually manage the assets of the Aon Hewitt collective investment trusts. Aon Hewitt hires one or more unaffiliated investment managers (or sub-advisors) to do the actual investing. Upon hiring the manager or sub-advisor, the assets of the Aon Hewitt collective investment trusts are invested in other investment vehicles, such as a mutual fund or collective investment trust, managed by the unaffiliated investment manager. Aon Hewitt collects an investment "advisory" fee charged to fund investors for its services in hiring the manager or sub-advisor, and Aon Trust Company charges an additional trustee fee. This structure results in investors paying multiple layers of fees, including an investment "advisory" fee to Aon Hewitt even though Aon Hewitt is not doing the actual selection of securities.

---

[5] *E.g.,* Aon Hewitt Collective Investment Trust Offering Statement, Oct. 2016, at 61–62 ("Oct. 2016 Offering Stmt."); Aon Investments USA Inc.*,* Form ADV Part 2A, Mar. 25, 2020, at 9.

45.     Defendants failed to conduct an independent investigation into the merits of the Aon Hewitt collective investment trusts prior to placing them in the Plan. Besides being Aon Hewitt funds selected by Aon Hewitt, the funds had a limited performance history of less than three years when Defendants decided to include them in the Plan. Over that limited history, *all* of the Aon Hewitt collective investment trusts underperformed the benchmarks selected by Aon Hewitt and their style-specific benchmarks. They also underperformed the comparable Plan mutual funds they replaced, which had established investment histories. As alleged in further detail *infra*, placing these funds in the Plan violated prudent fiduciary standards governing the selection, monitoring, and removal of Plan investments.

46.     As the investment adviser of these collective investment trusts, Aon Hewitt had a direct conflict of interest between acting in the exclusive best interest of Plan participants as the Plan's discretionary investment manager while also seeking to grow its collective investment trust business and maximize its revenue through investment advisory fees. Plan participants were not informed that Aon Hewitt was the entity that selected these investments. Plan participants also were not informed of the internal decision-making process that Defendants employed prior to selecting the Aon Hewitt funds.

47.     Following the decision to add the proprietary Aon Hewitt funds to the Plan, Aon Hewitt has earned substantial revenue from the investment advisory fees charged on the funds. Moreover, by causing the Plan to invest in its funds, Aon Hewitt dramatically increased its assets under management for these funds. For instance, the Plan's investment in the Aon Hewitt Large Cap Equity Fund and the Aon Hewitt Small & Mid Cap Equity Fund more than doubled the assets previously invested these funds. Aon Hewitt's collective investment trust business therefore has materially benefitted from the Plan's immediate and substantial investment of

hundreds of millions of dollars in Aon Hewitt's proprietary funds.

## II.   A prudent and loyal fiduciary would not have invested in Aon Hewitt's proprietary actively managed funds, which had insufficient performance histories and were plainly inferior to the funds they replaced and other options in the market.

### A.   The Aon Hewitt Large Cap Equity Fund (Class 1)

48.     Effective October 3, 2016, Defendants added the proprietary Aon Hewitt Large Cap Equity Fund (Class 1) to the Plan, which replaced the MFS Large Cap Value (R5) (MEIKX) and the T. Rowe Price Inst'l Large Cap Core Growth Fund (TPLGX). Defendants mapped over $90 million invested in those funds to the Aon Hewitt Large Cap Equity Fund.[6] "Mapping" refers to the process where the fund assets are sold, and the proceeds are transferred to the new investment option where they are reinvested.

49.     The Aon Hewitt Large Cap Equity Fund is still an investment option in the Plan. Using an active investment management strategy, the Fund seeks to achieve long-term growth of capital by investing in a diversified portfolio of primarily large-capitalization U.S. companies. Morningstar, Inc. is a leading provider of investment research and investment services, and is relied on by industry professionals. Defendants informed Plan participants of each fund's Morningstar asset category. Morningstar classifies the Aon Hewitt Large Cap Equity Fund in the large cap growth asset category and uses the Russell 1000 Growth Index as its style-specific benchmark. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. equity universe. Of the 1,000 largest companies based on market cap, the index includes a subset of those companies that exhibit higher price-to-book ratios and higher forecasted growth values.

50.     In an active investment strategy, the investment manager uses her judgment in

---

[6] According to the Plan's Form 5500, as of December 31, 2015, approximately $53 million was invested in the T. Rowe Price fund and $38 million in the MFS fund.

buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees, which are higher in actively managed than passively managed funds. In a passive investment strategy, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees for investment management services.

51. In light of the effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[7] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

52. To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs,*

---

[7] https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

*and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

53.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). But the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

54.     Accordingly, investment costs are of paramount importance to prudent investment selection. A prudent fiduciary would not select as a plan investment option a more-expensive actively managed fund without determining that the fund is reasonably expected to outperform a cheaper index fund.

55.     When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate consistently superior long-term investment results. At a minimum, prudent fiduciaries require a five-year performance history for an investment option prior to its inclusion in a 401(k) plan.

56.     The Aon Hewitt Large Cap Equity Fund did not have a sufficient performance

record when it was added to the Plan. The Fund was created on October 1, 2013.[8] It therefore

had only three years of history when it was added to the Plan, and less than three years when

Defendants decided to add it to the Plan. As of June 30, 2016, the Aon Hewitt Fund

underperformed the benchmark identified by Aon Hewitt (S&P 500 Index) every year of its short

existence, including by 267 bps since inception.[9] In comparison to its style-specific large cap

growth benchmark (Russell 1000 Growth Index), the Aon Hewitt Fund underperformed by 100

bps in 2014, and 667 bps in 2015. Over that two-year period, the Fund underperformed the

Plan's existing large cap growth option (the T. Rowe Price Inst'l Large Cap Core Growth Fund).

For the most recent calendar year before it was included in the Plan, the Aon Hewitt Fund

dramatically underperformed the T. Rowe Price fund by *1,234 bps.*

57.     Prior to its removal in October 2016, the T. Rowe Price Inst'l Large Cap Core

Growth Fund was a Plan investment option since 2011. The T. Rowe Price fund is comparable to

the Aon Hewitt Large Cap Equity Fund as shown by Defendants' decision to map its assets to

the Aon Hewitt Large Cap Equity Fund. Like the Aon Hewitt Fund, Morningstar classifies the T.

Rowe Price Inst'l Large Cap Core Growth Fund in the large cap growth asset category and

identifies the Russell 1000 Growth Index as its style-specific benchmark. The T. Rowe Price

fund had a consistent history of outperforming its benchmark and peers. As of December 31,

2015, the fund outperformed the S&P 500 Index and its style-specific benchmark (Russell 1000

Growth Index) over one-, five-, and ten-year periods.[10] And as of June 30, 2016, the fund

outperformed the S&P 500 Index over three-,  five-, and ten-year periods. From 2011 through

---

[8] Oct. 2016 Offering Stmt. at 62.

[9] *Id.*

[10] T. Rowe Price Institutional Equity Funds, Inc., Form N-1A, May 1, 2016,
https://www.sec.gov/Archives/edgar/data/1012968/000101296816000020/ief485b.htm#1_2; T. Rowe
Price Institutional Funds, Inc., Form N-CSR, Dec. 31, 2015,
https://www.sec.gov/Archives/edgar/data/1012968/000120677416004567/arlcc_ncsr.htm.

2015, the T. Rowe Price fund ranked in the top decile to quartile of its peer group for four out of those five years. T. Rowe Price also charged fees comparable to Aon Hewitt.

58.     The Aon Hewitt Large Cap Equity Fund was also inferior to other comparable funds in the market, such as the Vanguard Growth Index Fund (Instl) (VIGIX), a passively managed large cap growth index fund. Like the Aon Hewitt Large Cap Equity Fund, Morningstar classifies the Vanguard index fund in the large cap growth asset category and uses the Russell 1000 Growth Index as its benchmark. From 2014 through 2019, the Vanguard index fund charged 4 to 8 bps, while Aon Hewitt charged approximately 44 to 47 bps for the Aon Hewitt Large Cap Equity Fund (Class 1), up to 488% more.[11] For the two calendar years that the Aon Hewitt Large Cap Equity Fund had an actual performance history, the Large Cap Equity Fund substantially underperformed the Vanguard index alternative by 157 bps in 2014, and 433 bps in 2015.[12]

59.     Because the Aon Hewitt Large Cap Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Aon Hewitt Large Cap Equity Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

---

[11] Oct. 2016 Offering Stmt. at 57; Aon Hewitt Collective Investment Trust Offering Statement, June 2019, at 65 ("June 2019 Offering Stmt."); Astellas US Retirement and Savings Plan Participant Disclosure Notice, May 14, 2020, at 7 ("Astellas Fee Disclosure"); Morningstar.

[12] Unless otherwise indicated, for purposes of performance comparisons and damages calculations in this complaint, the lower-cost Class I shares were used for the Plan's Aon Hewitt collective investment trusts.

60.     Since the Aon Hewitt Large Cap Equity Fund was included in the Plan, it has underperformed both its style-specific benchmark and passively managed equivalents. By including the Aon Hewitt Large Cap Equity Fund in the Plan, Defendants caused Plan participants to lose over $15.6 million of their retirement savings as measured by the difference in the investment returns between Aon Hewitt Large Cap Equity Fund and the Vanguard Growth Index Fund (VIGIX). This is a conservative estimate of the Plan's losses. Compared to the performance of the T. Rowe Price Inst'l Large Cap Core Growth Fund (TPLGX), which Defendants should have retained as the Plan's actively managed large cap growth option rather than using the Aon Hewitt Large Cap Equity Fund, Plan participants lost in excess of $28.5 million of their retirement savings.

**B.     The Aon Hewitt Small & Mid Cap Equity Fund (Class 1)**

61.     Effective October 3, 2016, Defendants added the proprietary Aon Hewitt Small & Mid Cap Equity Fund (Class 1) to the Plan. The Aon Hewitt Fund replaced three investment options in the Plan: the Touchstone Mid Cap Value Fund (Instl) (TCVIX), the AMG TimesSquare Mid Cap Growth Fund (Instl) (TMDIX), and the DFA Small Cap Fund (I) (DFSTX). Defendants mapped over $63.2 million invested in those three funds to the Aon Hewitt Small & Mid Cap Equity Fund.[13]

62.     The Aon Hewitt Small & Mid Cap Equity Fund is still an investment option in the Plan. Using an active investment management strategy, the Fund seeks to achieve long-term growth of capital by investing in a diversified portfolio of primarily small and mid-sized U.S. companies. Morningstar classifies the Fund in the mid-cap growth asset category and uses the Russell Mid Cap Growth Index as its style-specific benchmark. The Russell Mid Cap Growth

---

[13] According to the Plan's Form 5500, as of December 31, 2015, $11.7 million was invested in the Touchstone fund, $30.5 million in the AMG fund, and $21.1 in the DFA fund.

Index measures the performance of the mid-cap growth segment of the U.S. equity universe. Of the approximately 800 of the smallest securities based on their market cap, the index includes a subset of those companies that exhibit higher price-to-book ratios and higher forecasted growth values.

63.     The Aon Hewitt Small & Mid Cap Equity Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[14] The Fund therefore had only three years of performance at the time it was included in the Plan, and less than three years of history when Defendants decided to add it to the Plan. As of June 30, 2016, the Fund underperformed the benchmark identified by Aon Hewitt (Russell 2500 Index) over all reporting periods, including 166 bps since inception.[15] For 2014 and 2015, the Fund also underperformed the style-specific mid-cap growth index (Russell Mid Cap Growth Index) by 650 bps and 410 bps, respectively.

64.     For the two full calendar years that the Aon Hewitt Small & Mid Cap Equity Fund had an actual performance record (2014 and 2015), the Fund also underperformed the Plan's existing AMG TimesSquare Mid Cap Growth Fund (TMDIX), which was a mid-cap growth fund benchmarked to the Russell Mid Cap Growth Index. Prior to its removal in October 2016, the AMG TimesSquare fund was a Plan investment option since at least 2010. As of June 30, 2016, the AMG TimesSquare fund outperformed its benchmark over one-, five-, and ten-year periods. For the five-year period from 2011 through 2015, the fund ranked in the 36th percentile or better in its peer group for four out of those five years.

65.     The Aon Hewitt Small & Mid Cap Equity Fund was also inferior to other comparable funds in the market, such as the Vanguard Mid-Cap Growth Index Fund (Adm)

---

[14] Oct. 2016 Offering Stmt. at 62.
[15] *Id.*

(VMGMX), a passively managed mid-cap growth index fund. Like the Aon Hewitt Fund, Morningstar classifies the Vanguard index fund in the mid-cap growth asset category and uses the Russell Mid Cap Growth Index as its benchmark. From 2014 through 2019, the Vanguard index fund charged 7 to 9 bps compared to 70 to 73 bps charged by Aon Hewitt, which is up to 711% more.[16] For the two full calendar years that the Aon Hewitt Small & Mid Cap Equity Fund had an actual performance history (2014 and 2015), the Aon Hewitt Fund substantially underperformed the Vanguard index alternative by 808 bps and 332 bps, respectively.

66.     Because the Aon Hewitt Small & Mid Cap Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

67.     Since the Aon Hewitt Small & Mid Cap Equity Fund was included in the Plan, it has underperformed both its style-specific benchmark and passively managed equivalents. By including the Aon Hewitt Small & Mid Cap Equity Fund in the Plan, Defendants caused Plan participants to lose in excess of $15.8 million of their retirement savings as measured by the difference in investment returns between the Aon Hewitt Small & Mid Cap Equity Fund and the Vanguard Mid-Cap Growth Index Fund (VMGMX). This is a conservative estimate of the Plan's losses. Compared to the AMG TimesSquare Mid Cap Growth Fund (TMDIX), which Defendants

---

[16] Oct. 2016 Offering Stmt. at 57; June 2019 Offering Stmt. at 65; Astellas Fee Disclosure at 8; Morningstar.

should have retained as the Plan's actively managed mid cap growth option rather than using the Aon Hewitt Small & Mid Cap Equity Fund, Plan participants lost in excess of $20.8 million of their retirement savings.

**C.    The Aon Hewitt Non-U.S. Equity Fund (Class 1)**

68.    Effective October 3, 2016, Defendants replaced the American Funds EuroPacific Growth Fund (R6) (RERGX) with the proprietary Aon Hewitt Non-U.S. Equity Fund (Class 1). From the American Funds mutual fund, Defendants mapped over $39.6 million in assets to the Aon Hewitt Non-U.S. Equity Fund.[17]

69.    The Aon Hewitt Non-U.S. Equity Fund is still an investment option in the Plan. Using an active investment management strategy, the Fund seeks to achieve long-term growth of capital by investing in a diversified portfolio of primarily non-U.S. equity securities. Morningstar classifies the Fund in the foreign large cap growth asset category and uses the Morgan Stanley Capital International All Country World Index Excluding U.S. Growth Index (MSCI ACWI Ex-US Growth Index) as its style-specific benchmark. The MSCI benchmark index captures large and mid-cap securities exhibiting growth style characteristics across 22 developed markets countries (excluding the United States) and 26 emerging markets countries.

70.    The Aon Hewitt Non-U.S. Equity Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[18] The Fund therefore had only three years of performance at the time it was included in the Plan, and had less than three years of history when Defendants decided to add it to the Plan. As of June 30, 2016, the Fund underperformed the benchmark identified by Aon Hewitt (MSCI ACWI Ex-

---

[17] Amount reported in the Plan's Form 5500 as of December 31, 2015.
[18] Oct. 2016 Offering Stmt. at 62.

US Index) for the quarter, year-to-date and one year.[19] In 2014 and 2015, the Aon Hewitt Non-U.S. Equity Fund underperformed its style-specific benchmark (MSCI ACWI Ex-US Growth Index) by 178 bps and 160 bps, respectively.

71.     For the two full calendar years that the Aon Hewitt Non-U.S. Equity Fund had an actual performance history (2014 and 2015), the Fund substantially underperformed the Plan's existing American Funds EuroPacific Growth Fund (RERGX) by 178 bps and 299 bps, respectively. The American Funds EuroPacific Growth Fund was added to the Plan during 2010. The fund is comparable to the Aon Hewitt Non-U.S. Equity Fund as shown by Defendants' decision to map its assets to the Aon Hewitt Fund and their use of the same benchmark index (MSCI ACWI Ex-US Growth Index) to evaluate the performance of the fund. It also had a consistent history of outperforming its benchmark and peers. As December 31, 2015, the fund outperformed the benchmark (MSCI ACWI Ex-US Index) over one-, five-, and ten-year periods.[20] In addition, as of June 30, 2016, the fund outperformed the MSCI ACWI Ex-US Growth Index over one-, three-, and five-year periods. From 2011 through 2015, the American Funds fund ranked in the 40th percentile or better among its peers in four out of those five years. The American Funds EuroPacific Growth Fund also charged fees comparable to the Aon Hewitt Fund before it was removed from the Plan.[21]

72.     The Aon Hewitt Non-U.S. Equity Fund was also inferior to other comparable funds in the market, such as the Vanguard Total World Stock Index Fund (Instl) (VTWIX). The Vanguard index fund is a passively managed foreign index fund that provides shareholders broad

---

[19] *Id.*

[20] EuroPacific Growth Fund, Form N-1A, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/719603/000005193116002500/eupac485b.htm. Because R6 shares did not have ten years of performance, the

[21] Astellas US Retirement and Saving Plan, *Your Guide to Upcoming 401(k) Transition*, at 18 ("Transition Guide"); Morningstar.

exposure to stock markets around the world, including developed and emerging markets. From 2014 through 2019, the Vanguard index fund charged 8 to 15 bps compared to approximately 42 to 47 bps charged by Aon Hewitt, which is up to 213% more.[22] The Vanguard index fund therefore is a reasonable lower-cost alternative to the Aon Hewitt Non-U.S. Equity Fund. For the two full calendar years that the Aon Hewitt Fund had an actual performance history (2014 and 2015), the Fund substantially underperformed the Vanguard index alternative by 807 bps and 64 bps, respectively.

73.    Because the Aon Hewitt Non-U.S. Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

74.    Since the Aon Hewitt Non-U.S. Equity Fund was included in the Plan, it has underperformed both its style-specific benchmark and passively managed equivalents. By including the Aon Hewitt Non-U.S. Equity Fund in the Plan, Defendants caused Plan participants to lose substantial retirement savings as measured by the difference in investment returns between the Aon Hewitt Non-U.S. Equity Fund and the Vanguard Total World Stock Index Fund (VTWIX). This is a conservative estimate of the Plan's losses. Compared to the American Funds EuroPacific Growth Fund (RERGX), which Defendants should have retained as the Plan's

---

[22] June 2019 Offering Stmt. at 65; Oct. 2016 Offering Stmt. at 58; Astellas Fee Disclosure at 6; Morningstar.

actively managed foreign investment option rather than using the Aon Hewitt Non-U.S. Fund, Plan participants lost even more of their retirement savings.

### D. The Aon Hewitt Inflation Strategy Fund (Class 1)

75. Effective October 3, 2016, Defendants replaced the PIMCO Real Return Fund (Instl) (PRRIX) with the proprietary Aon Hewitt Inflation Strategy Fund (Class 1). From the PIMCO fund, Defendants mapped over $9.3 million in assets to the Aon Hewitt Inflation Strategy Fund.[23]

76. The Aon Hewitt Inflation Strategy Fund is still an investment option in the Plan. Using an active investment management strategy, the Fund seeks to provide total return in excess of inflation by primarily investing in debt securities, including Treasury Inflation-Protected Securities. Morningstar classifies the Fund in the inflation-protected bond asset category and identifies the Barclays U.S. Treasury Inflation Protected Securities ("TIPS") Index as its benchmark.

77. The Aon Hewitt Inflation Strategy Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[24] The Fund therefore had only three years of performance at the time it was included in the Plan, and had less than three years of history when Defendants decided to add it to the Plan. As of June 30, 2016, the Fund underperformed its custom benchmark developed by Aon Hewitt over all reporting periods.[25] For the two full calendar years the Fund had an actual performance record (2014 and 2015), the Aon Hewitt Inflation Strategy Fund also substantially underperformed the Barclays U.S. TIPS benchmark index by 367 bps and 366 bps, respectively. Moreover, over that

---

[23] Amount reported in the Plan's Form 5500 as of December 31, 2015.
[24] Oct. 2016 Offering Stmt. at 61 (Class I Shares).
[25] *Id.*

time period, the Fund underperformed the Plan's existing PIMCO Real Return Fund (PRRIX) by 345 to 235 bps annually, which was a comparable inflation-protected bond fund benchmarked to the same index.

78.     The Aon Hewitt Inflation Strategy Fund was also inferior to other comparable funds in the market, such as the Vanguard Inflation-Protected Securities Fund (Instl) (VIPIX). Like the Aon Hewitt Fund, the Vanguard fund invests in Treasury inflation-protected securities. Morningstar also classifies the Vanguard fund in the inflation-protected bond asset category and uses the Barclays U.S. TIPS Index as its benchmark. Since before 2015, the Vanguard fund charged 7 bps, while Aon Hewitt charged approximately 20 to 26 bps for the Inflation Strategy Fund, which is up to 271% more.[26] For the two full calendar years that the Aon Hewitt Inflation Strategy Fund had an actual performance history (2014 and 2015), the Fund substantially underperformed the Vanguard alternative by 410 to 343 bps annually.

79.     Because the Aon Hewitt Inflation Strategy Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, or whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Inflation Strategy Fund in the Plan only served to benefit Aon Hewitt.

80.     Since the Aon Hewitt Inflation Strategy Fund was included in the Plan, it has underperformed both its benchmark and passively managed equivalents. By including the Aon

---

[26] Oct. 2016 Offering Stmt. at 57; June 2019 Offering Stmt. at 65; Astellas Fee Disclosure at 10; Morningstar.

Hewitt Inflation Strategy Fund in the Plan, Defendants caused Plan participants to lose retirement savings as measured by the difference in investment returns between the Aon Hewitt Inflation Strategy Fund and the Vanguard Inflation-Protected Securities Fund (VIPIX). This is a conservative estimate of the Plan's losses. Plan participants would not have lost even more of their retirement savings had Defendants retained the PIMCO Real Return Fund (PRRIX) rather than replacing this fund with the Aon Hewitt Inflation Strategy Fund.

E.      The Aon Hewitt Core Plus Bond Fund (Class 1)

81.     Effective October 3, 2016, Defendants replaced the PIMCO Total Return Fund (Instl) (PTTRX) with the proprietary Aon Hewitt Core Plus Bond Fund (Class 1). From the PIMCO fund, Defendants mapped over $39.3 million in assets to the Aon Hewitt Core Plus Bond Fund.[27]

82.     The Aon Hewitt Core Plus Bond Fund is still an investment option in the Plan. Using an active investment management strategy, the Fund seeks to achieve a total return from current income and capital appreciation by investing in a diversified portfolio of fixed income securities. Morningstar classified the Fund in the intermediate-term bond asset category and identifies the Barclays U.S. Aggregate Bond Index as its benchmark. The Barclays U.S. Aggregate Bond Index measures the performance of investment grade, U.S. dollar-denominated, fixed-rate taxable bonds, including Treasuries, government-related and corporate securities, and mortgage-backed securities.

83.     The Aon Hewitt Core Plus Bond Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[28] The Fund therefore had only three years of performance at the time it was included in the Plan,

---

[27] Amount reported in the Plan's Form 5500 as of December 31, 2015.
[28] Oct. 2016 Offering Stmt. at 62.

and had less than three years of history when Defendants decided to add it to the Plan. As of June 30, 2016, the Fund underperformed its custom benchmark developed by Aon Hewitt over all reporting periods.[29] For the 2014 and 2015, the Fund also underperformed the Barclays U.S. Aggregate Bond Index by 87 bps and 60 bps, respectively. In addition, over that two-year period, the Fund underperformed the Plan's existing PIMCO Total Return Fund (PTTRX), which was a comparable intermediate-term bond fund benchmarked to that same index.

84.     The Aon Hewitt Core Plus Bond Fund was also inferior to other comparable funds in the market, such as the Vanguard Intermediate-Term Bond Index Fund (Instl Plus) (VBIUX), a passively managed intermediate-term bond fund. Morningstar classified the Vanguard index fund in the intermediate-term bond asset category and uses the Barclays U.S. Aggregate Bond Index as its benchmark. From 2014 through 2019, the Vanguard index fund charged 4 to 5 bps compared to approximately 25 to 34 bps charged by Aon Hewitt, which is up to 750% more.[30] For the two full calendar years that the Aon Hewitt Core Plus Bond Fund had an actual performance history (2014 and 2015), the Aon Hewitt Fund substantially underperformed the Vanguard index alternative by 186 bps and 132 bps, respectively.

85.     Because the Aon Hewitt Core Plus Bond Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its benchmark or a passively managed equivalent, Defendants failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, or whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon

---

[29] *Id.*
[30] June 2019 Offering Stmt. at 65; Astellas Fee Disclosure at 10; Transition Guide at 17; Morningstar.

Hewitt.

86.    Since the Aon Hewitt Core Plus Bond Fund was included in the Plan, it has

underperformed both its benchmark and passively managed equivalents. By including the Aon

Hewitt Core Plus Bond in the Plan, Defendants caused Plan participants to lose substantial

retirement savings as measured by the difference in investment returns between the Aon Hewitt

Core Plus Bond Fund and the Vanguard Intermediate-Term Bond Index Fund (VBIUX). Plan

participants also would not have lost retirement savings had Defendants retained the PIMCO

Total Return Fund (PTTRX) rather than replacing this fund with the Aon Hewitt Core Plus Bond

Fund.

**III.    The Astellas Defendants breached their fiduciary duties by causing the Plan to pay
         unreasonable investment management fees.**

87.    When providing investments to plan participants, the importance of fees cannot be

overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the

prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties.

RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828

(citing RESTATEMENT (THIRD) OF TRUSTS §90 in finding a continuing duty to monitor under

ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence

in the investment function." RESTATEMENT (THIRD) OF TRUSTS §90 cmt. b.

88.    It is a simple principle of investment management that the larger amount an

investor has available to invest, the lower the investment management fees that can be obtained

in the market for a given investment vehicle. Large retirement plans have substantial bargaining

power to negotiate low fees for investment management services through separately managed

accounts, collective investment trusts, and lower-cost share classes for mutual fund and

collective investment trust investments.

89.     Mutual funds and collective investment trusts frequently offer multiple share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund or collective trust have the identical manager, are managed identically, invest in the same portfolio of securities, and allocate their assets the same. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

90.     Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.[31]

91.     Given the Plan was as a large plan based on its size, the Plan had tremendous bargaining power to obtain share classes with far lower costs than higher-cost shares. Lower-cost share classes of the Plan's investments were readily available. To the extent the Plan's investments advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if the

---

[31] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR, Jan. 2011, http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

Astellas Defendants had requested such a waiver. *See Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013) (finding based on evidence at trial that "mutual funds will often waive an investment minimum for institutional share classes" for large 401(k) plans, and that "[i]t is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.").

92.     Fund providers explicitly acknowledge the ability of plan fiduciaries to negotiate for lower-cost shares. For instance, Vanguard recognizes this ability and expressly "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial economies in the servicing of their accounts."[32]

93.     The Astellas Defendants had the fiduciary authority or responsibility over the selection and retention of the share class used for each of the Plan's investments. Aon Hewitt expressly disclaimed any responsibility over the selection of share classes for the Plan's investments. Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, the Astellas Defendants selected and continue to maintain higher-cost shares for Plan investment options than were available to the Plan based on its substantial size.

94.     In connection with restructuring the Plan's investment lineup in October 2016, the Astellas Defendants represented to Plan participants that Astellas was "making available the *lowest* overall cost share class of each fund".[33] By selecting and maintaining higher-cost share classes for certain Plan investments thereafter, the Astellas Defendants acted *contrary* to that

---

[32] *See* Vanguard Funds Multiple Class Plan, https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanvanguardfun.pdf.
[33] Transition Guide at 6 (emphasis added).

express representation made to Plan participants.

95.　　. The Astellas Defendants selected and retained the Class 1 shares of the five Aon Hewitt collective investment trusts included in the Plan. The Astellas Defendants made this decision even though lower-cost Class I shares were available for 10 bps less for each investment.[34] This caused Plan participants to pay up to 100% more for the exact same investment.

96.　　By providing Plan participants the more expensive share classes of Plan investment options, the Astellas Defendants caused participants to lose amounts of their retirement savings.[35]

## CLASS ACTION ALLEGATIONS

97.　　29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

98.　　In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following classes:

> **Investment Loss Class:** All participants in the Astellas US Retirement and Savings Plan whose Plan accounts invested in any of the Plan's five Aon Collective Investment Trusts at any time between October 3, 2016 and June 30, 2020 and whose investment in at least one of the Aon Collective Investment Trusts earned less as of June 30, 2020 than the account would have earned had it been invested in the corresponding Legacy Investment

---

[34] Oct. 2016 Offering Stmt. at 57; June 2019 Offering Stmt. at 65.
[35] Plan losses will be carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

Option(s).[36]

**Payment of Plan Assets Class:** All participants in the Astellas US Retirement and Savings Plan whose Plan accounts invested in any of the Plan's five Aon Collective Investment Trusts at any time between October 3, 2016 and June 30, 2020.[37]

**Equitable Relief Class:** All participants in the Astellas US Retirement and Savings Plan with account balances as of the date of judgment.

99.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Classes include over 3,000 members and are so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Classes because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Classes because each

---

[36] Excluded are members of the Board of Directors of Astellas US LLC ("Board") and the Astellas Retirement Plan Administrative Committee ("Committee"). Plaintiffs define the term "Legacy Investment Option(s)" to comprise eight options: MFS Large Cap Value R5 (MEIKX); T. Rowe Price Institutional Large Cap Core Growth (TPLGX); AMG TimesSquare Mid Cap Growth Institutional (TMDIX); Touchstone Mid Cap Value Fund Institutional (TCVIX): DFA Small Cap Fund I (DFSTX); American Funds Europacific Growth R6 (RERGX); PGIM Total Return Fund R6 (PTRQX); and PIMCO Real Return Institutional (PRRIX).

[37] Excluded are Board and Committee members.

Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

       d.    Plaintiffs are adequate representatives of the Classes because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Classes, are committed to the vigorous representation of the Classes, and have engaged experienced and competent attorneys to represent the Classes.

       e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

100.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter

as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

101.     Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Classes and is best able to represent the interests of the Classes under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

    o "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012).

    o "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

- o "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

- o U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

- o U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432, at *2.

- o U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

  > Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

  *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs'

attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made
to ERISA litigation, including educating the Department of Labor and federal courts
about the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the
> Plaintiffs whose litigation clarified ERISA standards in the context of investment
> fees. The litigation educated plan administrators, the Department of Labor, the
> courts and retirement plan participants about the importance of monitoring
> recordkeeping fees and separating a fiduciary's corporate interest from its
> fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation
  which included $57 million in monetary relief and substantial affirmative relief to benefit
  participants, the court found that "The law firm Schlichter, Bogard & Denton has
  significantly improved 401(k) plans across the country by bringing cases such as this one,
  which have educated plan administrators, the Department of Labor, the courts and
  retirement plan participants about the importance of monitoring recordkeeping fees." No.
  06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations
  omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief
  Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8
  (M.D. N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in
  a significant monetary award to the class but have also brought improvement to the
  manner in which the Plans are operated and managed which will result in participants and
  retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found
  Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of
  litigation" that has "dramatically brought down fees in defined contribution plans" after
  the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 16-
  2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison
  International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address
  the issue of excessive fees in a defined contribution plan—in which the Court held in a
  unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor
  investments and remove imprudent ones[.]" *Id*. at 1829. Schlichter, Bogard & Denton
  successfully petitioned for a writ of certiorari, and obtained amicus support from the
  United States Solicitor General and AARP, among others. Given the Court's broad
  recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA
  defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York

Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See*, *e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[38] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[39] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[40] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[41] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[42] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [43] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[44] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[45] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[46]

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO THE AON HEWITT COLLECTIVE INVESTMENT TRUSTS

102.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

103.    This Count alleges breach of fiduciary duties against all Defendants.

104.    Defendants are required to act "solely in the interest" of participants and to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims".  29 U.S.C. §1104(a)(1)(A)–(B). Defendants are directly

---

[38] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[39] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[40] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[41] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[42] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[43] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[44] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[45] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[46] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

105. Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining the Aon Hewitt collective investment trusts in the Plan. Instead of acting solely in the interest of Plan participants, Defendants put their own interests first, selecting and retaining the Aon Hewitt collective investment trusts because of the benefits they provided to Aon Hewitt, which came at the expense of participants' retirement savings. While Aon Hewitt received hundreds of millions of dollars in Plan assets as seed money for its investment management business and significant fee revenues, participants sustained massive losses in retirement savings due to high fees and poor performance. Moreover, Defendants failed to engage in a reasoned decision-making process to determine that using the Aon Hewitt funds was in the best interests of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. Defendants' decision to add the proprietary Aon Hewitt funds to the Plan caused the Plan and participants to incur significant performance losses.

106. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

107. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count

and is subject to other equitable or remedial relief as appropriate.

108.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III: PROHIBITED TRANSACTIONS (29 U.S.C. §1106) AGAINST DEFENDANTS RELATED TO THE AON HEWITT COLLECTIVE INVESTMENT TRUSTS

109.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

110.     This Count is asserted against all Defendants.

111.     Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). Aon Hewitt is a Plan fiduciary, and caused the Plan to use Aon Hewitt collective investment trusts and to pay Plan assets to Aon Hewitt. Aon Hewitt therefore dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

112.     Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a). Aon Hewitt is a party in interest because it is a Plan fiduciary, and an entity providing services to the Plan. 29 U.S.C. §1002(14)(A) and (B). Defendants caused the Plan to

use Aon Hewitt collective investment trusts and to pay Plan assets to Aon Hewitt. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

113.    As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to Aon Hewitt and the lost investment returns on those assets.

114.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

### COUNT IV: FAILURE TO MONITOR FIDUCIARIES AGAINST THE ASTELLAS DEFENDANTS

115.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

116.    This Count is asserted against the Astellas Defendants.

117.    Astellas, acting through the Astellas Board, oversees the overall governance of the Plan and has discretionary authority or control over the selection, monitoring, and removal of Plan investments and Plan service providers. Astellas had the authority to delegate in writing any of its fiduciary responsibilities, including allocating such responsibilities to the Administrative

Committee and Aon Hewitt.

118.    To the extent any of the fiduciary responsibilities of Astellas, the Astellas Board or the Administrative Committee were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

119.    A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

120.    The Astellas Defendants breached their fiduciary monitoring duties by, among other things:

     a.   failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

     b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable investment management fees and imprudent investment options in violation of ERISA;

     c.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

     d.   failing to remove appointees and delegees whose performance was inadequate in

that they continued to allow unreasonable fees to be charged to Plan participants
and imprudent investment options to be selected and retained in the Plan, all to
the detriment of Plan participants' retirement savings.

121.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered
substantial losses. Had the Astellas Defendants and the other delegating fiduciaries discharged
their fiduciary monitoring duties prudently as described above, the Plan would not have suffered
these losses.

## JURY TRIAL DEMANDED

122.    Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs
demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan
participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as
  described above;

- find and adjudge that Defendants are personally liable to make good to the Plan
  all losses to the Plan resulting from each breach of fiduciary duty, and to
  otherwise restore the Plan to the position it would have occupied but for the
  breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be
  calculated;

- order Defendants to provide all accountings necessary to determine the amounts
  Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Classes their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

February 28, 2022

Respectfully submitted,

/s/ Troy A. Doles
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter, No. 2488116
Michael A. Wolff, No. 6206003
Troy A. Doles, No. 6242803
Heather Lea, No. 6276614
Sean E. Soyars, MO No. 57317
Kurt C. Struckhoff, No. 6302037
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*Class Counsel for Plaintiffs*

DEGRAND LAW, P.C.
Luke DeGrand
10 S. LaSalle Street, Ste. 3400
Chicago, IL 60603
(312) 236-9200
(312) 236-9201 (fax)
ldegrand@degrandlaw.com

*Local Counsel for Plaintiffs*